# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| ANTHONY J. MARQUES and | : | Bankruptcy No. 05-31854DWS |
| ELENA M. MARQUES, | : | |
| | : | |
| Debtors. | : | |
| | : | |
| INTERNATIONAL FIDELITY | : | Adversary No. 05-0661 |
| INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ANTHONY J. MARQUES, | : | |
| ELENA M. MARQUES, | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Complaint of International Fidelity Insurance Co. ("International") seeking an Order denying the discharge of Debtors' obligation to it under bonds issued to secure payment and performance by Metro UTC ("Metro") of construction contracts with various municipalities.  Debtor Anthony J. Marques ("Anthony") is the owner and principal of Metro.  Both he and his wife Elena, who has no involvement in Metro, guaranteed repayment of any draw on the bonds.  As grounds for the relief it

seeks, International relies on 11 U.S.C. § 523(a)(4) which excepts from discharge any debt for defalcation while acting in a fiduciary capacity.[1]  Trial of this adversary proceeding was held on September 20, 2006 and the briefing schedule concluded. However, contemporaneously with its post-trial brief International filed a Motion to Supplement the Record ("Supplement Motion") which was opposed by Debtors.  A hearing was held on November 13, 2006. For the reasons that follow, I deny the Supplement Motion and will enter judgment in favor of Debtors.

## BACKGROUND

In February 2000 Anthony formed Metro, a general contractor which installed sewers and water mains for municipalities.  Public bids were solicited for these government contracts.  When a contract was awarded, Metro was required to secure payment and performance bonds.  Anthony was solely responsible for Metro's operations, including payment of its bills.

While the company started with small jobs, by 2002 its revenues were in excess of $3 million.  The jobs were not always profitable.  In February 2002 Metro became enmeshed in a $4.1 million job for Franklin Township to the exclusion of other jobs and ultimately made no profit due to unexpected costs.  A bond claim was made and paid out of a loan from Progress Bank.  International did not bond Metro at that time.  The following year Metro had

---

[1]  Plaintiff had pled 523(a)(6) in the Complaint but withdrew those grounds by the time of trial.

another problem job but its prospects had improved with existing contracts and backlog bids

when International started bonding it in July 2003.  While Metro had a net loss of $100,000

in 2003, it had revenue of $6 million in 2004 and was profitable.  However, it was still

paying its subcontractors for old jobs and while it had a $4 million back log of work, it did

not get started on those jobs until the end of 2004 which impacted its cash flow.  A line of

credit in the amount of $375,000 and term loan of $650,000 for capital equipment were the

company's sole financial resources other than its job revenues.  At the end of 2004 cash flow

was tight and bond claims began to be made.

Anthony first met with International's senior claims manager and counsel George

Rettig ("Rettig") in February 2005 about Metro's financial problems.  Anthony told Rettig

that he was thinking of financing Metro's equipment and hopeful that the result of this step

would ameliorate the cash crunch.  Thirty days later Anthony learned that International had

contacted the municipalities that they should make payment to it, and not Metro.  As a result,

Metro's cash flow was further impaired.  The little availability under its line of credit was

used to make payroll for a couple of periods.  During this period Anthony stated he gave

International all the documents it requested and cooperated with its consulting firm which

was assessing Metro's present and future contracts.  He also provided International with a list

of critical payments and International advanced funds while it was determining what action

to take.  Ultimately Anthony could not convince International to let him finish the contracted

jobs which it took over, and Metro ceased operating on May 5, 2005.

International paid bond claims for Metro jobs in the aggregate amount of

$2,636,620.92. Exhibit IF-41.[2] This amount has not been reduced by the application of receivables it collected directly from the municipalities after it sent out its demand letter. International's claims against Anthony and Elena arise from an Agreement of Indemnity they executed on or about July 1, 2003 (the "Agreement"). Exhibit A to Complaint. International's grounds for seeking an exception to their discharge derive from a provision of the Agreement ("Paragraph Fourth") that states:

### TRUST FUND

FOURTH: If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

Id. at 2-3.

In April 2005 International retained Nihill & Riedley who assigned Peter Faschia, ("Faschia") a bond specialist, to perform an accounting of the bond claims. The results of his investigation provide the basis for International's contentions that Anthony and Elena

---

[2] Exhibit IF-41 is a summary of the amount paid by project and bond number. It was admitted without opposition. None of the eight contracts that are referenced were made part of the trial record.

violated the alleged express trust of the Agreement.  Examining the cash disbursements journals, Faschia looked for questionable disbursements, which, according to International, included all expenditures for other than labor and materials on bonded jobs.  He identified payments made between December 18, 2003 and June 30, 2005 in the amount of $1,943,911.20 which he concluded were for other than labor and materials on bonded jobs. Exhibit IF-40.  Anthony verified that the funds were spent as reflected in Exhibit IF-40 and while some of the expenditures were for labor and materials on bonded jobs, many were not. However, with some exceptions,[3] the payments were legitimate business expenses. He further explained that Metro had one operating checking account into which all receipts were deposited and from which all business expenses were paid.  Metro did not maintain separate accounts for each job.[4]

Notably Elena, a receptionist at a hair salon, was not involved in any aspect of Metro's affairs.  She did not have check signing authority and made no decisions for the business.  Her only knowledge of Metro's business came through general family discussions with Anthony about his work.

**DISCUSSION**

---

[3]  The business bought a car for Elena and paid the automobile expenses incurred by Elena and Anthony's parents.

[4]  Faschia also examined Metro's general ledger and was unable to trace deposits of certain retainages identified in Exhibit IF-42 into the account statements.  However, he acknowledged that no deposit would have been made if the retainage had been withheld by the township.  Anthony testified that the general ledger did reflect all financial events and that the reason that the retainage did not appear as a deposit was that it was merely held to the end and credited in the actual amount when released.

A.

A central purpose of the Bankruptcy Code is to provide a procedure by which the poor but honest debtor can reorder his affairs, make peace with his creditors, and enjoy "a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699 (1934). Accord Insurance Co. of America v. Cohn (In re Cohn), 54 F.3d 1108, 1113 (3d Cir. 1995) ("The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start.") For this reason, exceptions to discharge are strictly construed against creditors and liberally interpreted in favor of debtors. Id.; United States v. Stelweck, 108 B.R. 488, 495 (E.D. Pa. 1989).

As the party objecting to discharge, Plaintiff must prove all of the elements of defalcation or fraud by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 288-89, 111 S.Ct. 654, 660 (1991); Stone v. Feldman (In re Feldman), 111 B.R. 481, 485 (Bankr. E.D. Pa. 1990). While courts are split as to the burden of proof a plaintiff bears regarding the existence of a fiduciary relationship (i.e., clear and convincing evidence, In re Shervin, 112 B.R. 724, 730 (Bankr. E.D. Pa. 1990), or the lower  preponderance of the evidence, Windsor v. Librandi (In re Librandi), 183 B.R. 379, 382 (M.D. Pa. 1995), the differing viewpoints do not have to be reconciled in this case because, as discussed below, the existence of the express trust is a legal, not factual issue.

Plaintiff seeks relief under § 523(a)(4) which excepts from discharge any debt for

-6-

fraud or defalcation while acting in a fiduciary capacity.  It contends that Anthony and Elena's indemnity of International's payment of the bonds was subject to an express trust which was violated when payments were made for other than labor and materials on bonded jobs.  In order for a plaintiff to prevail under the fiduciary prong of § 523(a)(4), a plaintiff must prove that (1) the debtor was acting in a fiduciary capacity; and (2) while acting in that capacity, the debtor engaged in fraud or defalcation. Fowler Brothers v. Young (In re Young), 91 F.3d 1367, 1371 (10th Cir. 1996); Harris v. Dawley (In re Dawley), 312 B.R. 765, 776-77 (Bankr. E.D. Pa. 2004); Librandi, 183 B.R. at 382.

## B.

The term "fiduciary capacity" under § 523(a)(4) generally has a narrower meaning in bankruptcy than its traditional common law definition.  Dawley, 312 B.R. at 777. The fiduciary (debtor) must hold an express or technical trust on behalf of the beneficiary (creditor).  Id.(citing cases). The fiduciary relationship must have existed prior to or independent of the particular transaction from which the debt arose.  The debt must be due to the fiduciary acting in that capacity.  Pennsylvania Manufacturers' Association Insurance Co. v. Desiderio (In re Desiderio), 213 B.R. 99, 102-03 (Bankr. E.D. Pa. 1997).

While the question of whether a debt is dischargeable under section 523(a)(4) is a question of federal law, courts also look to state law to determine whether the requisite trust relationship has been established. Tudor Oaks Ltd Partnership v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir. 1997); Young, 91 F.3d at 1371; Librandi, 183 B.R. at 382. In Pennsylvania, an express trust is established when four elements are present:

1) an express intent to create a trust; 2) an ascertainable *res*; 3) a sufficiently certain beneficiary; and 4) a trustee who "owns" and administers the *res* for the benefit of the beneficiary.  Librandi, 183 B.R. at 382-83; Desiderio, 213 B.R. at 103.  Plaintiff contends an express trust exists by reason of Paragraph Fourth of the Agreement.

Debtors do not deny that the elements of an express trust are present in Paragraph Fourth of the Agreement nor could they.  The document evidences an agreement by the Contractor (Metro) and Indemnitors (Anthony and Elena) that all payments received on account of the contract (an ascertainable res) be held in trust (express intent to create a trust) by them (the trustees) for the payment of obligations under the contract and for labor, materials and services furnished in the prosecution of the work provided for in the contract (a sufficiently certain beneficiary).  This language or some slight variant thereof has repeatedly been found to constitute an express trust every time it served as the basis of a § 523(a)(4) challenge to dischargeability.  See Mountbatten Surety Company, Inc. v. McCormick (In re McCormick), 283 B.R. 680, 682 (Bankr. W.D. Pa. 2002); International Fidelity Insurance Co. v. Herndon (In re Herndon), 277 B.R. 765, 767 (Bankr. E.D. Ark. 2002) (Mixon, J.); Wright v. Gulf Insurance Co. (In re Wright), 266 B.R. 848, 849 (Bankr. E.D. Ark. 2001) (Scott, J.); Mountbatten Surety Company, Inc. v. Smith (In re Smith), 238 B.R. 664, 671 (Bankr. W.D. Ky 1999); Gillespie v. Jenkins (In re Jenkins), 110 B.R. 74, 76 (Bankr. M.D. Fla. 1990).  Rather Debtors rely on the prefatory language of the Paragraph Fourth which limits the circumstances when a trust is established, i.e., only if the bonds "are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof" (the "Prefatory Language").

It is undisputed that Debtors did not raise this point until their closing argument at which time their counsel contended that International had failed to prove an element of its claim by producing no evidence that the contracts at issue by their terms prohibited the assignment of the contract price.   International proffers a two-prong argument to Debtor's contention:  (1) the language in the Paragraph Fourth when read with the Paragraph Third unconditionally creates a trust notwithstanding the Prefatory Language[5] and (2) the contracts (or at least some of them) did by their terms prohibit assignment.[6]   Unfortunately for International none of the contracts were made part of the trial record which was closed at the conclusion of the trial on September 20, 2006.   To attempt to remedy this deficiency International filed the Supplement Motion which is opposed by the Debtors.[7]

While this contest has focused on the Prefatory Language and International's effort to reopen the record to prove that the condition precedent has been satisfied, International alternatively maintains that this evidence is irrelevant arguing that the Prefatory Language

---

[5]  The trust language relied upon by International in the cases it cites does not have the Prefatory Language.  However, that language is present in <u>Wright</u>, <u>supra</u>, a case not cited by the parties.  Apparently the <u>Wright</u> debtor did not raise that language to argue that the condition to the formation of the trust had not been met since the Court, which found the existence of an express trust from that agreement, did not discuss it.

[6]  The operative language is a prohibited assignment of the contract <u>price</u>, not assignment of the contract as International states.

[7]  At the conclusion of the trial when the Debtors argued that International had not proven that the condition to the establishment of a trust had been met, International claimed that they had waived the "affirmative defense."  That position appears to have been abandoned in favor of this attempt to prove the element of its cause of action.  Notably while framed as a motion to supplement the record, the record has been closed.  More accurately, International should have filed a motion to reopen the record.  Since it is clear that was intended and Debtor has not contended otherwise, I will treat it as such.

does not establish a condition precedent to the creation of an express trust. Thus, my first task is to review the language of the Agreement as urged by International to determine whether an express trust was created notwithstanding the Prefatory Language because if so, the additional proof will not be required.

(1)

International argues that if I focus on the language in the Paragraph Fourth after the semicolon, i.e., "and further, it is expressly understood that and declared that all monies due ...under any contract... are trust funds," I will note that there is no conditional language to that declaration that all monies are trust funds. Moreover, International argues that the anti-assignment condition of the Paragraph Fourth must be read with the assignment provisions of the Paragraph Third which it states "speaks to the situation in which the assignment provisions in Paragraph Third may not be available." International Post-Trial Brief at 10.[8] Paragraph Third provides International with an assignment of the contract as security which is only effective in the event of a breach of the Agreement or certain other adverse circumstances.[9] According to International's counsel, if International is unable to secure this

---

[8] I did not understand this one sentence argument. At the hearing on the Supplement Motion, International counsel sought and I allowed him to elaborate. My sense of his position is addressed herein although I frankly admit it is still not clear to me.

[9] Paragraph Third reads as follows:

The Contractor, Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or

(continued...)

assignment because it is prohibited, the trust is a supplemental remedy.  I take this to mean

that although the collateral assignment contemplated by Paragraph Third may be prohibited,

International will still have its trust rights to the contract payments and that is the implicit

meaning of the first clause of Paragraph Fourth.  This remedy, he argues, is separate and

apart from the second clause which does not contain the Prefatory Language.

---

[9](...continued)
hereafter incurred, the assignment in the case of each contract to become effective
as of the date of the bond covering such contract, but only in the event of (1) any
abandonment, forfeiture or breach of any contracts referred to in the Bonds or of
any breach of any said Bonds- or (2) of any breach of the provisions of any of the
paragraphs of this Agreement; or (3) of a default in discharging such other
indebtedness or liabilities when due; or (4) of any assignment by the Contractor
for the benefit of creditors' or of the appointment, or of my application for the
appointment, of a receiver or trustee for the Contractor whether insolvent or not;
or (5) of any proceeding which deprives the Contractor of the use of any of the
machinery, equipment, plant, tools or material referred to in section (b) of this
paragraph; or (6) of the Contractor's dying, absconding, disappearing,
incompetency, being convicted of a felony, or imprisoned if the Contractor be an
individual- (a) All the rights of the Contractor in, and growing in any manner out
of, all contracts referred to in the Bonds, or in, or growing in any manner out of
the Bonds; (b) All the rights, title and interest of the Contractor in and to all
machinery, equipment, plant, tools and materials which are now, or may hereafter
be, about or upon the site or sites of any and all of the contractual work referred to
in the Bonds or elsewhere, including materials purchased for or chargeable to any
and all contracts referred to in the bonds, materials which may be in process of
construction, in storage elsewhere, or in transportation to any and all of said sites;
(c) All the rights, title and interest of the Contractor in and to all subcontracts let
or to be let in connection with any and all contracts referred to in the Bonds, and
in and to all surety bonds supporting such subcontracts; (d) All actions, causes of
actions, claims and demands whatsoever which the Contractor m3y [sic] have or
acquire against any subcontractor, laborer or materialman, or any person
furnishing or agreeing to furnish or supply labor, material, supplies, machinery,
tools or other equipment in connection with or on account of any and all contracts
referred to in the Bonds; and against any surety or sureties of any subcontractor,
laborer, or materialman; (e) Any and all percentages retained and any and all
sums that may be due or hereafter become due on account of any and all contracts
referred to in the Bonds and all other contracts whether bonded or not in which
the Contractor has an interest.

-11-

I find both these arguments are unpersuasive. First, there is no reference in Paragraph Fourth to Paragraph Third which would require them to be read together. Nor does it make sense why the assignment rights provided in Paragraph Third, which reach beyond the contract price and payments and are triggered only by an adverse situation, would need to be amplified in Paragraph Fourth, particularly without any explanation.[10]   Finally, International reads meaning not present in the Prefatory Language in suggesting that the first clause of Paragraph Fourth stands alone for the purpose of clarifying Paragraph Third, i.e., that even if the bonds are executed in connection with a contract that prohibits the Paragraph Third assignment (and thus it loses its security), the bonding company still receives the payments in trust as provided in the second clause. This interpretation is strained and unsupported by the document. Pines Plaza Bowling, Inc. v. Rossview, Inc., 394 Pa. 124, 145 A.2d 672, 676 (1958) (In construing a contract, the agreement must be interpreted as a whole, and the words given their ordinary meaning).

The Prefatory Language clearly establishes a condition precedent, (i.e., "**if** any of the Bonds are executed in connection with a contract which by its terms prohibits the assignment of the contract price") to the parties' agreement to hold payments received on account of such contract in trust. AAR International, Inc. v. Vacancies Heliades S.A., 202 F.Supp.2d 788, 800 (E.D. Ill. 2002) ("Conditions precedent are generally indicated by the terms 'on the

---

[10]   Indeed the purpose of the Paragraph Third assignment appears to be to provide the bonding company with the rights it would need to take over the projects on default. Moreover, Paragraph Fourth speaks of a prohibition on assignment without any reference to whether the assignment would be to International or some other third party. In any event, I make no findings on the intent of either Paragraph but read both according to their plain language. International did not seek to elicit any parole evidence so that counsel's explanation can only be measured by the words of his client's own document.

condition,' 'subject to,' 'when,' 'as soon as,' or other similar terms."). <u>See</u> <u>also</u> <u>United</u>

<u>Electric Co. v. Allstates Mechanical Ltd.</u>, 2004 WL 1386239, at *2 (Pa.Com.Pl. June 17,

2004) ("Such terms as 'if,' 'provided that', or 'on condition that' or some similar phrase of

conditional language are normally required to create a condition precedent."). The second

clause in Paragraph Fourth serves a distinct purpose:  whereas the first clause states that

payments <u>received</u> shall be held as trust funds, the second clause states that monies that are

<u>due and to become due</u> are trust funds.  The nature of the monies is the same, <u>i.e.</u> they are

from construction contracts.  Logic dictates that both payments (received, and due and to

become due) shall be treated the same, and the Prefatory Language modifies both clauses.

The monies are or are not trust funds without regard to when they are paid. Moreover, it

seems counterintuitive that monies (paid or unpaid) can be held as trust funds or become trust

funds if the contract price or any part thereof has been assigned.  Only by prohibiting

assignment can the trust not interfere with contractual rights of third-parties.

International's interpretation leads to a nonsensical result.  By virtue of the first clause

of Paragraph Fourth, payments already received shall be held as trust funds, but only if the

bonds are executed with a contract that prohibits assignment.  Conversely, by virtue of the

second clause, monies due or to become due shall be held as trust funds regardless of whether

assignment is prohibited.  Let us hypothesize that Metro has two separate contracts: Contract

A, which contains an anti-assignment clause and Contract B, which does not prohibit

assignment.  Further assume that monies are owed to Metro on both contracts.  Under

International's construction of Paragraph Fourth, those expected funds under both contracts

are held in trust.  However, on the day of payment to Metro, Contract A monies remain trust

funds but Contract B monies lose that status by the mere fact that they have been paid to the purported trustee.  This simply makes no sense.  Why would one impose a fiduciary duty on a party over fund that they have no control over and then take away that duty once the "trustee" has receipt, i.e. actual control over those funds?   International provides no reasonable answer, and the Court can fathom none.

In addition, International's interpretation of Paragraph Fourth  gives no effect to the Prefatory Language.  By taking the second clause in isolation, there is no purpose to the first clause.  On the other hand, both clauses can be read to give meaning to both:  the parties agree that all payments shall be held in a trust fund if the contracts prohibit the assignment of the price and in such case, both the monies received and the monies due under those contracts are trust funds.  It is a general principal of contract interpretation that in construing a contract a court should give meaning to all its words and phrases and adopt a construction that avoids surplusage.  Washington Hospital v. White, 889 F.2d 1294, 1300 (3d Cir.1989); Continental Insurance Co. v. Allstate Insurance Co., 820 F.Supp. 890, 897 (E.D. Pa. 1993).

As I have concluded that the Prefatory Language does establish a condition precedent to the creation of a trust and as the proof at trial did not address this element of International's case, International has not established the first element of § 523(a)(4), i.e., the debtor was acting in a fiduciary capacity. Whether it can remedy this fatal defect by new evidence will turn on the outcome of the Supplement Motion and the evidence it seeks to admit.

(2)

A motion to reopen the record after trial is committed to the sound discretion of the

trial judge. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); Rochez Brothers v. Rhoades, 527 F.2d 891, 894 n.6 (3d Cir. 1975). The court's decision is informed by a number of factors: what burden is placed on the parties and their witnesses; what undue prejudice may result by not taking new testimony; and what consideration should be given to judicial economy. Id. As a general rule, the failure to put in to evidence all the proof necessary for a judgment is fatal error. Youngstown Sheet and Tube Company v. Lucey Products Company, 403 F.2d 135, 139 (5th Cir. 1968). The fatality may be avoided in certain instances where the interest of justice calls for "judicial tolerance." Rochez, 527 F.3d at 894. The Third Circuit suggests that the court may permit additional evidence where there has been a misunderstanding among the parties and trial court or where there is an ambiguity of the rules of practice and procedure. Even if neither of these circumstances are present, it may be necessary to take further evidence to insure substantial justice. Id.[11] However, "where the proferred 'new' evidence is insufficiently probative to offset the procedural disruption caused by the opening," trial courts act within their discretion to refuse to reopen the record. Rivera- Flores v. Puerto Rico Telephone Company, 64 F.3d 742, 746 (1st Cir. 1995) (citing Thomas v. SS Santa Mercedes, 572 F.2d 1331, 1336 (9th Cir. 1978) (affirming denial of motion to reopen where 'new' evidence would have provided little additional probative force).

I thus begin with an examination of the evidence that International seeks to make part of this record to determine whether its admission would even make its case that the

---

[11] In Rochez, the plaintiff had proven liability but the evidence necessary for the court to calculate damages was insufficient. The record was reopened to allow the court to arrive at an intelligent estimate of damages without speculation.

contracts for which payment was not made contained prohibitions on the assignment of the contract price.  The proffered contract extracts allegedly relate to five of the eight Metro contracts.  I state allegedly because the first flaw in the record sought to be made is that International's attorney has not attached the entire contract but rather the face page and the presumably relevant provision.  I am unable to discern from Exhibit B (Philadelphia Standard Contract Requirements) to the Supplement Motion and Exhibit C (Wilmington, Delaware Standard Specifications for Construction) to the Supplement Motion that the documents are project contracts and specifically contracts for the bonded jobs for which claims have been made.  While the Affidavit of George Rettig ("Rettig Affidavit") so states, he does not explain how he would have personal knowledge of contracts Metro entered into with third parties.  While the Middletown Borough (Exhibit A to Supplement Motion) and New Hanover Township (Exhibit D to Supplement Motion) documents are complete and refer to the respective projects, they do not contain an absolute prohibition on assignment.  Rather they allow assignment upon written consent of the owner (i.e., municipality).  Rettig avers that he is not aware of either owner (Middletown Borough or New Hanover Township)[12] ever consenting to an assignment.  Again the Rettig Affadavit does not explain how the affiant would have knowledge of whether a consent had been given.  Thus, without more, it appears that the proffered supplementation has not established the satisfaction of the condition precedent to the creation of the trust.

---

[12]  He makes the same claim about the City of Wilmington which has the same qualified prohibition in its Standard Specifications for Construction.  The only document reflecting an absolute prohibition on assignment was the Philadelphia Standard Contract Requirements which I have observed is not on its face connected to the specific bonded jobs for which claims have been made.

At the hearing on the Supplement Motion, Debtors' counsel argued that Debtors would be prejudiced by the reopening of the record as it would protract and make more costly this legal proceeding which has otherwise been concluded.  Testing that contention, I asked International's counsel whether he sought to reopen the record solely for the evidence proffered with the Supplement Motion or for other evidence not identified.  Seeking to refute the prejudice argument, he assured me that his supplementation would be limited to the Rettig Affidavit and the documents attached thereto.  However, as noted above, admission of this supplemental evidence does not change the outcome.  Exhibit 41 consists of a summary of the bond claims paid by International according to project, bond number and amount paid.  Based on this document, International contends it has a non-dischargeable claim against both Debtors in the amount of $2,636,620.92.  Absent the contract documents for Radnor, Quakertown, Palethorpe Street (Philadelphia), Stoney Creek (New Castle, Delaware), Cobbs Creek (Philadelphia), Red Lion Trunkline (New Castle, Delaware) or proffered testimony that connects the Philadelphia and Wilmington, Delaware standard contract specifications to these contracts, International's new evidence still does not prove that the contracts for these bonded jobs prohibited assignment.  Moreover the Middletown and New Hanover contracts which were provided in their entirety allow assignment upon consent, and Rettig's Affidavit does not negate that possibility.  Thus, the absence of probative value to the proffered evidence weighs against the reopening of the record.

Additionally I note that none of the factors discussed by the Rochez court are present in this case.  There was no misunderstanding among the parties and court, only a faulty assumption by International's attorney, Robert Carlton, Esquire ("Carlton") about proving

the elements of his case.  According to Carlton, the fact that the Debtors did not raise the

failure of a condition precedent as an affirmative defense in the Answer or Joint Pretrial

Statement, did not put him on notice that he had to prove that element of his claim.[13]

I respectfully disagree.

The Federal Rules of Civil Procedure provide that:

> [i]n pleading the performance or occurrence of conditions
> precedent, it is sufficient to aver generally that all conditions
> precedent have been performed or have occurred.  A general
> denial of performance or occurrence shall be made specifically
> and with particularity.

Fed.R.Civ.P. 9(c)(incorporated in bankruptcy by Fed.R.Bankr.P. 9009(c).  "'Rule 9(c) has

---

[13] Given the pleading requirements, a few courts characterize the failure of a condition
precedent as an affirmative defense.  See In re Midway Airlines, Inc., 1993 WL 65673, at *9
(Bankr. N.D. Ill. 1993) (placing the burden of proof on the defendant to prove each of the essential
elements of the failure of conditions precedent defense by a preponderance of the evidence).
Consequently, many defendants plead the defense as such.  See, e.g., Bodewes v. Ulico Casualty
Co., 336 F.Supp.2d 263, 279 (W.D.N.Y. 2004) (defendant's eighth affirmative defense is that
Trustees failed to satisfy the condition precedent to coverage); Uniroyal, Inc. v. Heller, 65 F.R.D.
83, 94 (S.D.N.Y. 1974) (failure to perform a condition precedent pleaded as an affirmative defense);
Friedman v. Chesapeake and Ohio Railway Co., 261 F.Supp. 728, 729 (S.D.N.Y. 1966) (defendants'
answers assert an affirmative defense that plaintiffs lack standing to bring action because of their
failure to perform certain conditions precedent as required by the bonds and indenture on which
plaintiffs' claims are based).  However, most jurisdictions agree that although the pleading burden
may be placed on the defendant under Rule 9(c) to raise the issue of nonperformance of a condition
precedent, the burden of proof remains with the plaintiff to demonstrate that the condition precedent
was fulfilled.  See First Tennessee Bank National Association v. Barreto, 268 F.3d 319, 328 n.6
(6th Cir. 2001) (noting most jurisdictions, including federal law, place the burden of proof on the
plaintiff to prove that the condition precedent was satisfied); Mellon Bank, N.A. v. Aetna Business
Credit, Inc., 619 F.2d 1001, 1008 (3rd Cir. 1980) (applying Pennsylvania law that plaintiff had the
burden of showing that the borrowers were solvent as a condition precedent to recovery for breach
of defendant's promise).  Based upon the allocation of the burdens of proof, noncompliance with
a condition precedent is not technically an affirmative defense.  See, e.g., Mellon Bank, 619 F.2d
at 1008 n.6 (pleading the nonoccurrence of the condition precedent as an affirmative defense is
incorrect, despite the fact that the defendant properly made a specific denial of the condition
precedent as required by Rule 9(c)).  A condition precedent is a defense that merely negates an
element of the plaintiff's prima facie case, while a true affirmative defense raises a new element.
In re Noroton Heights Enterprises Corp., 96 B.R. 11,14 (Bankr. D. Conn. 1989).

the effect of forcing defendant to raise the issue [of noncompliance with a condition precedent] whenever he believes there actually is a question about performance.'" Walton v. Nalco Chemical Co., 272 F.3d 13, 21 (5th Cir. 2001) (*quoting* 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1304 (2d ed. 1987)). Therefore if the complaint includes a general averment that all conditions precedent to the suit or recovery have been met, then the defendant must deny the satisfaction of the preconditions specifically and with particularity. Walton, 272 F.3d at 21.

However if a plaintiff does not plead that any or all of the conditions precedent have been satisfied, the defendant is not required to specifically deny any conditions in order to force the plaintiff to meet his burden of proof. Garcia v. Sunbelt Rentals Inc., 310 F.3d 403, 404 n.4 (5th Cir. 2002). See also Walton, 272 F.3d at 22 n.14 (stating some courts hold that where a plaintiff fails to plead a general averment, the defendant doesn't need to assert "failure of performance" as an affirmative defense to preserve the issue and may raise the issue for the first time at trial). The appropriate inquiry in condition precedent cases is whether the complaint included an adequate "general averment" that the conditions precedent had been met. Id. at 22.

Applying these standards to the present case,  it must first be determined whether International generally averred that the condition required to trigger the formation of the trust had been satisfied.  The Complaint avers that monies were to be held by Metro and Defendant-Debtors as a trust fund pursuant to Paragraph Fourth, Complaint ¶ 22, and that the Debtors diverted monies, "which each of them agree were Trust Funds." Id. ¶ 24.  It further

-19-

alleges that that "[n]otwithstanding Metro's receipt of these contract monies, the terms of the Indemnity Agreement and fiduciary duties owed by Metro and the Debtors to IFIC," IFIC was compelled to pay the bond claimants, which resulted in a liquated loss for IFIC. Complaint ¶ 27.  Although these allegations claim that the Debtors failed in their fiduciary capacity with regard to the trust, there is no general averment that all conditions to the formation of the trust were satisfied.  If a defendant is required to deny the fulfillment of conditions precedent specifically and with particularity, then at the very least the language of Rule 9(c) should be tracked in the complaint.   Fitz-Patrick v. Commonwealth Oil Company, 285 F.2d 726, 729 (5th Cir. 1960).

In short, as a result of International's failure to generally aver that it performed the necessary conditions precedent to the Indemnity Agreement and its trust provision, Debtors were not required to specifically claim noncompliance with the conditions precedent. Thus, International cannot complain that it has been surprised by Debtors' failure to plead noncompliance as an affirmative defense or note it as a disputed issue for trial in the Joint Pretrial Statement.   It cannot assume that it was relieved of its burden to prove the satisfaction of the condition precedent because Debtor, which had no obligation to do so, did not highlight the deficiency in its proposed case.  International simply  seeks a second bite at the apple to introduce evidence which it had in its possession and which it should have anticipated would be needed since the issue of whether a trust exists is a threshold matter of proof in this § 523(a)(4) case.

**CONCLUSION**

For the foregoing reasons, I deny International's Supplement Motion.  Based on the

record made at trial, judgment is entered for the Debtors as International has not established

the formation of a trust with its attendant fiduciary duties that would render International's

claims nondischargeable pursuant to § 523(a)(4).

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated:  November 30, 2006

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| ANTHONY J. MARQUES and | : | Bankruptcy No. 05-31854DWS |
| ELENA M. MARQUES, | : | |
| | : | |
| Debtors. | : | |
| | : | |
| INTERNATIONAL FIDELITY | : | Adversary No. 05-0661 |
| INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ANTHONY J. MARQUES, | : | |
| ELENA M. MARQUES, | : | |
| | : | |
| Defendants. | : | |

# ORDER

**AND NOW**, this 30th day of November 2006, after trial of the Complaint of International Fidelity Insurance Co. ("International") seeking an Order denying the discharge of Debtors' obligation to it pursuant to 11 U.S.C. §523(a)(4), and consideration of International's Motion to Supplement the Record (the "Supplement Motion"), and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that:

1.  The Supplement Motion is **DENIED**.

2.  Judgment is **GRANTED** in favor of **Defendants** and against Plaintiff. Debtors'

obligation to International is a debt dischargeable in this Chapter 7 case.

_____
      DIANE WEISS SIGMUND
      Chief U.S. Bankruptcy Judge